**In re WILLIAM, SUSAN, AND JOSEPH.**

**No. 81–399–Appeal.**

Supreme Court of Rhode Island.

Aug. 6, 1982.

Laureen D'Ambra, Legal Counsel, Dept. for Children and Their Families, Providence, for petitioner-appellee.

Pasco F. Loffredo, Cranston, for respondent-appellant.

## OPINION

KELLEHER, Justice.

This is an appeal from a decision of the Family Court terminating the parental rights of Gloria in her three children, William, Susan, and Joseph, aged seven, six, and four, respectively, at the time of the March 1981 trial.[1] The Department of Children and Their Families (DCF or the department) brought the termination action on the grounds that Gloria was an unfit parent by "reason of conduct or conditions seriously detrimental to the child * * * [namely] [e]motional illness, mental illness, [or] mental deficiency * * * of such duration as to render it improbable for the parent to care for the child for an extended period of time." General Laws 1956 (1981 Reenactment) § 15–7–7(b)(1). The petition was later amended by DCF to include as an additional ground for termination subsection (c) of § 15–7–7 which provides as a basis for the action that "[t]he parent has a child in the care of a licensed or governmental child placement agency, either voluntarily or involuntarily, for a period of at least six (6) months and the court further finds that the integration of the child into the home of the parent is improbable in the foreseeable future due to conduct or conditions not likely to change * * *."

At the close of all the evidence, the trial justice sitting without a jury found that DCF had proved its case by clear and convincing evidence under each of the two alleged grounds. We, of course, shall uphold the lower court's order for termination as long as we find that the case DCF presented under either one of the two grounds withstands appellate challenge.

With respect to that aspect of DCF's case which asserts that Gloria was an unfit parent because of mental deficiency or illness, the mother makes several assignments of error. First, she claims that her motion to dismiss made at the close of plaintiff DCF's case was improperly denied. She argues that in ruling against the motion, the trial justice totally ignored the crucial fact that the evidence presented on the issue of her mental health was outdated and thus without probative value. Gloria also claims that dismissal was warranted because DCF had not made a reasonable effort to encourage and strengthen the parental relationship she had with her children, a statutory condition precedent to termination. Finally, Gloria argues that the court misconceived or overlooked material evidence or otherwise clearly erred when it made as a factual finding that DCF had made reasonable efforts to nurture the parental relationship. We find no merit in these claims and therefore uphold the lower court's decision that Gloria's parental rights in the three children should be terminated on the basis of

---

1. Although the father's rights were also terminated in the Family Court proceeding, he is not a party to this appeal. The termination action will therefore be discussed only as it affects the mother's legal rights.

§ 15–7–7(b)(1), emotional illness, mental illness, or mental deficiency.

The department's leadoff substantive witness was Linda Spaziano, a social caseworker for the department. She testified that DCF's involvement with the family began in March 1976, when it received a complaint from an unnamed source in the community charging Gloria and her husband with child neglect. The agency temporarily maintained a supervisory eye on the children, but upon receiving a battered-child report on the youngest child, Joseph, filed by Roger Williams Hospital, DCF removed all three children from the home in late May 1977. Billy, the eldest, was eventually sent back to the parents, but after the elapse of some six months he reportedly arrived at school with a bruised body and bloody lip. A medical examination performed at the time revealed that Billy was malnourished and had lice in his hair. The department intervened, placed the boy in a special-needs school, and provided homes for the two younger children, Susan and Joseph, with foster parents.

Although the family was scattered, DCF maintained close contact through supervised gatherings of the family at least every other week. Ms. Spaziano's reports on what happened at these meetings paint a pitiful and grotesque picture of family life, one shaded with violence, irrationality, and squalor. She described the parents' behavior as often childlike, with the mother and father joining in the games and rivalries of their offspring, choosing sides whenever the children argued. She told how Gloria, in her husband's absence from the meetings, would complain that he was forcing her to have sexual relations with other men and that he talked frequently of molesting his own daughter and other children in the neighborhood. The witness testified that when Gloria discussed these problems with her, the mother would relate how her husband talked to her in sexually explicit terms of placing his penis on the children and of kissing their genital areas, despite the fact that this talk with the caseworker would obviously agitate Susan, who was present during some of the discussions. Ms. Spaziano reported that the mother would continue to discuss these matters unreservedly before the children, notwithstanding the social worker's attempts to discourage her. Ms. Spaziano reported that the allegations concerning the husband were always withdrawn whenever she raised the subject in the presence of the couple but would then again be repeated when she met with Gloria alone.

Ms. Spaziano also reported that Gloria would not always be actively attentive and receptive to her children during the visitations. The mother would sometimes play with the toys by herself, ignoring her children's attempts to gain her attention. During one visit Gloria remained unaware of her children for fifteen or twenty minutes while she stood in the middle of a room in a bewildered state, attempting to fix a broken toy. Ms. Spaziano reported that on several visits, she demonstrated incompetence at simple parental tasks, like changing diapers or securing the children's seat belts. One time, Ms. Spaziano watched one of the children approach the mother and ask what the book was that she held in her hand; the mother responded that it was a knife. A common scenario at the meetings involved violent verbal exchanges between the parents while the teary and frightened children looked on.

Many of the family visits were held at DCF's Children's Center in Providence, but on several occasions, the caseworker met with the group at the family's home. She described the house as dirty and smelly with soiled dishes, empty boxes, and clothes strewn throughout. Ms. Spaziano also said she made two daytime visits during which she found the house in eerie darkness with all the shades drawn.

The second substantive witness presented by DCF was Dr. Ben Feather, a psychiatrist who had examined Gloria in February and April of 1980 at the department's request. According to Dr. Feather's diagnosis, Gloria suffered from paranoid schizophrenia and mental retardation. He testified that he based the diagnosis of schizophrenia to

some extent upon observation of what he termed a "flat affect," that is, the patient's inability to modulate her voice or facial expression according to the topic being discussed. Noting a lack of spontaneity in responding to questions and apparent lapses in mental activity, Dr. Feather concluded that Gloria was experiencing "blocking," a diagnostic sign of schizophrenia and a condition that might well impair the mother's ability to care for her children because of her difficulty in responding to her environment. The doctor acknowledged that although there are treatments for schizophrenia which can bring about remission for varied lengths of time, the disease is incurable. Asked if Gloria could possibly become a capable mother if her schizophrenia were treated with psychotherapy and antipsychotic medication, he responded that such a recovery was improbable.

During his testimony, the doctor also referred to his diagnosis of Gloria as being mentally retarded to a moderate degree. He noted that this moderate retardation in and of itself would not keep her from being a fit parent so long as she could receive very extensive supportive services. On this point he recalled an example of a retarded woman who kept her children while maintaining a home with her sister who carried out most of the parenting responsibilities. But the doctor admitted that the type of services to which he referred was not available from the state and further conceded that in order to view the situation realistically, Gloria's mental retardation could not be viewed in isolation but had to be considered along with the schizophrenia. He was therefore of the opinion, based upon his evaluations conducted a year before trial, that Gloria would not be able to care for her children in the foreseeable future.

In reaching this conclusion, the doctor was particularly concerned with Gloria's lack of awareness that her son Billy had any psychological problems when in fact the doctor had seen evidence indicating that the boy was mentally retarded and borderline psychotic. It was his opinion that unawareness of these problems indicated that Gloria would be unable to give Billy the special care that a handicapped child would require.

The department's next witness was Judith Ferris, a clinical therapist at the Providence Mental Health Center, who had made a psychological evaluation of Gloria and her husband for the purpose of assessing their potential as parents; she measured this aptitude by considering such factors as their ability to use good judgment, to plan ahead, and to seek proper medical care for their children when necessary. Ms. Ferris stated that Gloria was "markedly limited" by her intellectual deficiencies and that her judgment was noticeably impaired. In particular, Ms. Ferris was concerned that as the children grew older and required more than custodial care, Gloria would be unable, because of her limitations, to function for them as an adequate parent. The witness also thought that if the woman were to be given custody of her children, she would require almost constant supervision, a social service unavailable from the existing state agencies. Referring to the written report of her evaluation of the couple, Ms. Ferris reiterated her sentiment that Gloria would most likely never be able to care for or provide an appropriate home for her children because she lacked "stability or judgment adequate to the task of parenting."

The final witness presented by DCF was Dr. Robert Wuraftic, a clinical psychiatrist specializing in psychiatric evaluations. He reported that he had evaluated Gloria in 1979 and that on the intelligence-scale test he had administered, Gloria had scored a composite IQ score of 72, placing her in the lower 6 percent of the population. Other tests given by the doctor suggested that Gloria suffered from elevated levels of tension, anxiety, depression, and feelings of inadequacy. With this in mind, the doctor stated that "[s]tress would not be a strong suit for the client." From the interview conducted as part of the evaluation, Dr. Wuraftic concluded that Gloria was well motivated to be reunited with her children but that at the time of the examination her tension level precluded the reunification. In summarizing his evaluation, he offered

the opinion that it was unlikely that the woman could effectively deal with her three children on a full-time basis in the foreseeable future.

At the close of the doctor's testimony, Gloria moved for dismissal on the grounds that the department relied upon stale psychiatric evidence and thereby failed to prove by a clear and convincing standard that she suffered from an emotional illness, mental illness, or mental deficiency of such duration as to make it unlikely that she could provide for her children for a prolonged period.

It is clear that at the March 1981 hearing the state built its "mentally-unfit parent" case on the opinions of Dr. Ben Feather, Judith Ferris, and Dr. Robert Wuraftic. Doctor Feather's opinion was based on evaluations conducted in February and April 1980 and the latter two opinions upon evaluations made September 7, 1979, and September 4, 1979, respectively. Thus when Gloria asserts that the freshest evidence presented on the issue of her mental health was nearly one year old at the time of trial, she is absolutely correct. But the critical question is whether or not the age of the evidence presented a basis for dismissal.

The staleness issue can best be resolved by examining the record, specifically the testimony of Dr. Ben Feather. The doctor testified that the schizophrenia from which Gloria suffered in and of itself rendered her unable to care for her children, that her disease was incurable, and that the medical treatments that have brought about remission in some patients would probably not be effective in Gloria's case. From these observations, Dr. Feather concluded that Gloria would be unable to care for her children for extended periods because of the state of her mental health.

▬ Had Gloria's condition been highly unstable or prone to change, dated psychiatric evidence might have been totally relevant in determining whether or not there might be prolonged periods ahead when Gloria's illness would interfere with her role as a mother. But in fact, Gloria represented a case in which accurate long-term medical predictions could be made. The testimony established that hers was an incurable and most likely an untreatable condition of such severity that it alone, considered apart from the mental retardation she suffered, rendered her unfit to parent her children. Because of the small likelihood of change in Gloria's mental condition from the time of the experts' examination until trial, Dr. Feather's testimony, and that of Ms. Ferris and Dr. Wuraftic in addition, lost little of its probative force by virtue of its age; consequently, reliance on this evidence was not error.

Gloria also claims that her motion to dismiss should have been granted because DCF had not made reasonable efforts to encourage and strengthen the parental relationship. She asserts that § 15–7–7 requires such an effort, or the termination petition must be denied.

We fully accept Gloria's reading of § 15–7–7 and its mandate for reasonable efforts. Several years ago in *In re LaFreniere*, R.I., 420 A.2d 82 (1980), we examined the provisions for termination of parental rights provided under the old G.L.1956 (1969 Reenactment) § 15–7–7, as amended by P.L.1970, ch. 132, § 1. We were there concerned with a petition brought by Child Welfare Services under the permanent-neglect provision, which defined a "permanently neglected child" as one whose parent or custodian failed to maintain contact with the child following placement of a child in an agency "notwithstanding efforts which shall be made by the said agency to encourage and strengthen the parental relationship." In our review of the trial justice's factual finding that the child-welfare agency had "made 'a substantial effort' " to foster this relationship, we concluded that such efforts had not in fact been made and that the record was replete with evidence that the agency worked at discouraging the LaFrenieres from visiting their children. We held that the lower court had overlooked this aspect of the agency's actions in making its findings; we therefore reversed its decision, stating that the agency was precluded from terminating parental rights

under the above-cited neglected-child provision when it had failed to discharge its statutory duty to "encourage and strengthen the parental relationship."

When the General Assembly amended § 15–7–7 in its January 1980 session, P.L. 1980, ch. 364, § 1, it extended the "reasonable efforts" requirement previously found only in the permanent-neglect provision to actions brought under any of the six grounds for termination. Thus, there can be no doubt that DCF was under an obligation to make these efforts for Gloria's and her children's mutual benefit. Gloria claims DCF unquestionably faltered in encouraging and strengthening the bond between her and her children when it did not implement a series of recommendations made by Dr. Wuraftic, a psychologist hired by the department to evaluate the mother.

These recommendations appear toward the end of a written report under the rubric "Diagnostic Impression and Recommendations": [2]

"(1) [Gloria] is seen as potentially benefiting from basic education courses, particularly in reading and arithmetic areas.

"(2) A thorough dental evaluation is also seen as indicated.

"(3) Marital therapy is viewed as being beneficial for the client. As well, supportive individual counseling approaches might well be helpful.

"(4) Data of a thorough neurological evaluation might further clarify any possible organic factors active in the client's case.

"(5) [Gloria] would be well advised to increase her overall activity level and, as well, increase her interpersonal contacts.

"(6) At the present time, it is unlikely that the client could effectively deal with the management of her three children on a full time basis. Indeed, her own tension level is seen as precluding this placement at the present time. By the same token, as [Gloria's] emotional condition improves and her tension and anxiety de-

crease, a gradually increasing visitation program might well be attempted at that point. Certainly, the client is well motivated for such a program."

■ We begin our analysis by recognizing that the triangular relationship that exists between DCF, a child under its care, and the child's parents is a highly sensitive and complex arrangement. An informed evaluation of DCF's efforts to strengthen the bond between the parents and the child can best be achieved through a "totality of the circumstances" approach. Cf., *Matter of Klug*, 32 A.D.2d 915, 916, 302 N.Y.S.2d 418, 419 (1969) (totality of circumstances proper test to determine if agency exerted "diligent efforts to encourage and strengthen the parental relationship"). Such an approach follows logically from the General Assembly's choice of the qualifier "reasonable," a word "elastic in its nature * * * [requiring a] consideration of the conditions and circumstances in determining what is reasonable in a particular situation." *Ouellet v. Shapiro*, 3 Conn.Cir. 268, 272, 212 A.2d 708, 710 (1965).

This "whole picture" approach, or at least a limited application of it, can be seen in Gloria's basic argument: Efforts to encourage and strengthen the parental relationship which are reasonable with respect to an average parent are not necessarily reasonable with respect to an intellectually limited person like herself.

As an example of where her special needs are an essential part of the "whole picture," Gloria cites Dr. Wuraftic's recommendation for individual counseling. Gloria asserts that although nothing more than a simple referral may be a "reasonable effort" with regard to an average parent, in light of her limitations, DCF should have made an appointment for her, picked her up, transported her to the doctor, and, in short, taken every conceivable step to ensure that she received counseling.

---

**2.** In his recommendations, Dr. Wuraftic identified Gloria by her married name. To preserve anonymity, we have modified the physician's record by deleting the married name and substituting the name "Gloria."

That the efforts required from DCF vary with the differing capacities of the parents involved is totally consistent with a "totality of circumstances" approach. But just as Gloria's particular needs are factored into the "reasonable efforts" equation, so too must be the reality that many of the services DCF might ideally have provided were unacceptable to Gloria or unavailable through the department.

Returning to the example of individual counseling, we note that DCF caseworker Spaziano repeatedly urged the mother to participate in counseling. She broached the subject in terms that a limited person could understand and tried to impress upon Gloria the important role therapy might play in keeping the mother and children united. She gave Gloria the telephone number for the Providence Mental Health Clinic, encouraged her to make an appointment, and assured her of transportation. Ms. Spaziano did not herself set the appointment for Gloria because the clinic's policy required the individual seeking counseling to make the appointment personally. Notwithstanding the steady assistance and encouragement offered by Ms. Spaziano, Gloria intransigently rejected individual counseling.

Marital counseling was another item on Dr. Wuraftic's list of recommendations which Gloria did not receive. But to judge the reasonableness of DCF's efforts here, we must consider Ms. Spaziano's testimony that marital counseling for limited partners was not available under existing social-service programs. Marital counseling was also unavailable in the sense that Gloria's husband was obstinate, violent, and uncompromising in his position that his family had no problems or need for outside help. In short, Gloria's argument that DCF's efforts must be branded "unreasonable" for failure to implement all of Dr. Wuraftic's proposals simply does not stand up when the complete picture is held up to view.

On the other hand, we are convinced that DCF worked efficiently, conscientiously, and faithfully to encourage and strengthen Gloria's parental relationship with her children. After the children were removed from their natural parents' home, DCF established a regular visitation schedule that provided for biweekly meetings of the parents and children. The department would collect the parents and children at their respective homes, transport them to the Children's Center in Providence, and provide a supervised setting for the gathering. Ms. Spaziano spent innumerable hours both during these meetings and at other times advising Gloria in family matters, providing medical assistance and alternative housing when necessary, setting up appointments, providing transportation, offering guidance, support, and, as the record dramatically illustrates, sincere compassion to the distraught and beleaguered mother. In addition to all this, Ms. Spaziano coordinated services available to Gloria from social-service agencies other than DCF.

■ Whether or not an agency has satisfied the statutory requirement to exert "reasonable efforts to encourage and strengthen the parental relationship" must, of course, be determined as each case is presented. Yet every decision on the reasonableness of such efforts must take into account the seriousness of the intrusion the hand of government makes when it reaches out to cut the parent-child tie. "The rights to conceive and raise one's children have been deemed 'essential' * * * 'basic civil rights of man' * * * and '[r]ights far more precious * * * than property rights.'" [Citations omitted.] *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558 (1972). The requirement that the child welfare agency seeking termination exert "reasonable efforts" to nurture the parental relationship has been said to express a societal judgment that the state should not take such a drastic step as termination without first attempting to rebuild the parent-child bond. Gordon, *Terminal Placements of Children and Permanent Termination of Parental Rights: The New York Permanent Neglect Statute*, 46 St. John's L.Rev. 215, 237 (1971).

■ While mindful of the gravity of a termination decree, we nevertheless find that under the totality of the circumstances

DCF made reasonable efforts to foster Gloria's parental relationship with her three children. Working directly through regular, supervised family gatherings and indirectly through repeated attempts to improve Gloria's physical and emotional life, DCF met the statutory obligation imposed by § 15–7–7.[3] The department may have been unsuccessful in achieving reunification, but in view of the difficulty of the task it faced, the failure cannot be attributed to an unreasonable lack of effort.

■ We need not dwell long on Gloria's final claim of error, that the trial justice misconceived or overlooked material evidence or otherwise clearly erred in finding as a fact that DCF had made reasonable efforts to encourage and strengthen the parental relationship between Gloria and her children. Our appellate responsibility in this area is to determine whether the finding of reasonable effort was supported by competent evidence or whether, in making such a factual determination, the trial justice misconceived or overlooked material evidence or was otherwise clearly wrong. *In re Kenneth*, R.I., 439 A.2d 1366, 1369 (1982); *In re Joseph*, R.I., 420 A.2d 85, 89 (1980). There is ample evidence indicating that the department discharged its obligation in a most exemplary fashion. Consequently, we see no reason to disturb the termination order entered in the above case.

Gloria's appeal is denied and dismissed, the decree appealed from is affirmed, and the case is remanded to the Family Court with our decision endorsed thereon.

3. Although the statute imposes an obligation to make reasonable efforts to encourage and strengthen the parental relationship, it provides no guidelines. In contrast, under New York law, the meaning of "diligent efforts by an agency to encourage and strengthen the parental relationship" as it appears in a provision similar to Rhode Island's G.L.1956 (1981 Reenactment) § 15–7–7 is statutorily defined. N.Y. Soc.Serv.Law § 384–b (McKinney 1981). Subsection f provides:

"(f) As used in this subdivision, 'diligent efforts' shall mean reasonable attempts by an authorized agency to assist, develop and encourage a meaningful relationship between the parent and child, including but not limited to:

(1) consultation and cooperation with the parents in developing a plan for appropriate services to the child and his family;

(2) making suitable arrangements for the parents to visit the child;

(3) provision of services and other assistance to the parents so that problems preventing the discharge of the child from care may be resolved or ameliorated; and

(4) informing the parents at appropriate intervals of the child's progress, development and health."

It is noteworthy that all four of the "suggested efforts" in New York's law were carried out by DCF.