In re KRISTINA L.

No. 85–396–Appeal.

Supreme Court of Rhode Island.

Feb. 5, 1987.

1. Not her real name.

Kevin J. Aucoin, Dept. for Children & Their Families, Francis B. Brown, Providence, Court Appointed Special Advocates, for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Paula Rosin, Asst. Public Defenders, Robert J. Ameen, Pawtucket, for defendants.

OPINION

SHEA, Justice.

This matter is before the court on appeal from a decision of the Family Court granting a petition to terminate parental rights filed by the Department of Children and Their Families (DCF). The petitioners have three minor children, and their parental rights were terminated only in regard to their middle child, Kristina. We reverse.

Kristina was born on October 25, 1979. Soon after her birth, she had trouble retaining her food and began to lose weight. Her mother, hereinafter referred to as Kate,[1] brought her to the Cranston Street Health Center, where the baby's formula was changed. Kristina's vomiting following feeding continued, and two days later Kate brought her to Pawtucket Memorial Hospital. The baby's feeding schedule was again adjusted but without result. In February 1980 Kate then brought the baby to Roger Williams Hospital, where Kristina

was admitted and spent two weeks. During the hospital stay, Kate visited frequently and actually spent one full night in the hospital with her baby. Kristina's health improved and she began to gain weight. At the end of two weeks Kate was informed that the child would not be released to her care. Kristina had been diagnosed as a "failure to thrive" infant, and the DCF had become involved in the case. The child was placed in a foster home and in May 1980 was placed with a second foster family with whom she has remained up to the present time. She has suffered no further significant medical problems.

Kate testified that she did not see Kristina for three months after she was released from the hospital and only then because she called her social worker for help. The first DCF worker assigned to Kristina's case, however, testified that supervised visitation began in Kate's home on February 19, 1980. The visitation schedule began with hourly visits once every other week. At that time, Kate and Kristina's father were unmarried and living apart although the father was at times present during the child's visits. In addition, Kristina's older brother (also a child of Kristina's father), then about eighteen months old, was and still is living with his mother. The social worker noted that at times both Kate and the boy looked unkempt and dirty and at other times the apartment looked "fairly clean." The DCF recommended that Kate participate in ongoing counseling sessions at Pawtucket Mental Health Center to work on her relationship with her children and to increase her knowledge of child development and proper methods of discipline. Kate agreed to attend counseling sessions and did so until she was discharged. The results of a May 1980 evaluation of Kate revealed maternal immaturity that, it was believed, could be improved with help. The treating psychiatrist testified on cross-examination that he had no direct evidence to support the fact that Kate's children should be removed from her.

By July 1980 Kristina had not been returned to Kate because the DCF felt Kate had not shown any signs of improvement in parenting abilities or housekeeping skills. Also in July, the first social worker left the case and was replaced by one who remains with the case today. The second case worker increased the parent-child visitation to two hour weekly visits, supervised, in Kate's home. The evidence shows that visits were often canceled through no fault of the mother. The caseworker described the barriers to reunification at that time as Kate's lack of parenting skills attributable in part to her youth, her lack of good housekeeping habits, and her lack of proper disciplining techniques in handling her older child. The caseworker felt Kate was too harsh verbally, although she stated she never saw Kate strike her child. She cited a lack of medical treatment for Kristina, even though, as noted above, before Kristina was removed from Kate's home at $3\frac{1}{2}$ months of age, Kate had visited three hospitals with the child because she was concerned about the baby's lack of weight gain. The caseworker testified that sometime between July and September 1980 she observed Kristina's older sibling with a runny nose and no clothes on from the waist down in Kate's home.

Visitation was again increased in the fall of 1980 to $3\frac{1}{2}$ hour unsupervised weekly visits. During this time, the DCF recommended that Kate attend two separate parenting programs. Kate attended neither and later testified that she was pregnant with her third child at the time and was unable to take the bus because she was both not feeling well and suffered anxiety attacks when riding a bus. In addition, Kate developed toxemia near the end of her third pregnancy.

Visits were shortened to $2\frac{1}{2}$ hours a week in the beginning of 1981. Kate's third child was born and has remained living with his mother. Following the recommendation of the DCF, Kate enrolled in a

STEP * program for parenting skills in April or May 1981 and attended six classes. She appeared excited about the program although attendance was difficult for her because of her need for babysitting services. Overnight visits began July 1, 1981, well over a year after Kristina had been removed from her home. The first planned overnight visit was canceled, however, because Kate failed to obtain a crib for Kristina.

Between August 1981 and the end of that year, Kristina visited her natural family weekly from Tuesday mornings through Thursday afternoons. At this time, the DCF recommended that Kate attend the CODAC * parenting program in Cranston. Because of the distance she had to travel from her home and her problems with riding a bus, Kate failed to attend. The caseworker observed that Kate's house was cluttered, with dirty dishes in the sink and a pile of dirty laundry in the living room. She noted that the apartment was in need of repair. In addition, the caseworker mentioned a lack of interaction and contact between Kate and Kristina. She observed that Kristina appeared reluctant to visit Kate. The child would be subdued when the caseworker came for her at the foster home and would "space out" in the car on the way to Kate's home. When the visit was over, Kristina appeared eager to leave.

During the first half of 1982, the caseworker testified, she recommended three or four more parenting programs for Kate but Kate did not agree to participate. Kate testified, however, that she did not recall the recommendations. In April 1982 the caseworker saw Kristina's withdrawal and failure to interact with Kate as the main barrier to her reunification with her natural family.

Visitation suspended during the summer of 1982 was not resumed until the end of the year because of an alleged incident brought to the attention of the DCF by the foster family. A scant investigation produced nothing, and visits were resumed

beginning Christmas day 1982. During this time, in November 1982 Kate and Kristina's father were married. The caseworker noted that the home continued to appear dirty. She noted the smell of urine and observed dirty blankets on the beds. More referrals for counseling were made. Kate went to the first parenting class offered at St. Luke's, which was within walking distance, but was informed that the classes had been canceled because of lack of participation. Kate testified that she made followup calls to the program to no avail.

Unsupervised visitation was resumed beginning in January 1983. Visits occurred weekly or at the discretion of the DCF from 9:30 a.m. to noon at Kate's home. By March 1983 Kristina was 3½ years old and had developed serious problems in conjunction with the visits with Kate. When the caseworker arrived to pick Kristina up at the foster home, the child would scream until she vomited, refuse to put on her coat, and run and hide. She was also having nightmares in the foster home, although Kate testified that the child was not bothered by nightmares while she was in her home. A May 1983 evaluation concluded that Kristina had bonded with her foster parents in that she looked to them as her major source of nurturing and support. Also, the contrast between the environments of the foster home and the natural home was frightening to the child. For these reasons, visits were often canceled or were rescheduled to occur in a neutral setting where the caseworker could stay close by. Kate testified that Kristina was much more withdrawn when the caseworker supervised the visit. Kristina had grown close to a worker from Court Appointed Special Advocates (CASA). Kate testified that the CASA worker, speaking to her about allowing Kristina to be adopted by her foster family, explained that the child would never want for anything in her new home.

* Not described in the record other than by name.

Beginning in March and continuing through September 1983, whenever possible, the visits were planned weekly, were supervised in a neutral setting, and included Kristina's siblings. At times, visits took place at the DCF. The visits were approximately 1 to 1½ hours in duration. Between the end of October 1983 and January 1984, visitation was again unsupervised in Kate's home for approximately one hour each week. Kristina's father was present for the visit whenever possible.

By mid–1983, Kate's relationship with the caseworker had deteriorated. Kate, often angry and hostile, asked that the DCF representative remove herself from the case. Kate became less cooperative, and she and Kristina's father retained new counsel and were advised not to sign any new case plans submitted by the DCF. The natural parents did not agree with the reasons given for their daughter's removal from their home, nor did they agree with the services provided by the DCF. Testimony revealed that more parenting classes were recommended to the natural parents, but no agreement to attend was reached.

In February 1984 the family entered the Kent County Mental Health Reunification Program (the program), which took over Kristina's visitation schedule. The program works intensively with parents who have had a child or children removed from their home and who are eager for the child to be returned to their home. It offers counseling on parenting issues, discipline techniques, and marital and individual problems. The program worked with Kristina and her parents twice each week in 2½ hour sessions. In addition, Kristina would visit her parent's home on another night during the week under supervised conditions through April 1984. By May 1984, Kristina was spending extended periods of unsupervised time with her parents. In June 1984 overnight visitation began, and by July 1984 she remained with her parents each Thursday through Saturday. In July 1984 the program recommended increasing the visits from three to five days

with reunification scheduled for the end of that month.

The program's representatives testified that at first Kristina appeared shy and withdrawn. She would cry in the car on the way to a session and was reluctant to interact with her parents. By the end of the third or fourth group meeting Kristina demonstrated marked improvement. She began to ask in the car if her brothers and parents would be attending the group session that day. She was more willing to interact with her parents, she'd sit with them at dinner, color and play with them, and frequently sit on a parent's lap. She began to refer to Kate as Mommy Kate. The improvement was especially marked when Kristina would attend the Saturday morning sessions with her family after spending the previous day and two nights with them. Kristina's father would often bring his guitar to the sessions, and at one point the family brought a tape of a song they had all sung together. This progress continued. The child no longer vomited in anticipation of a visit to her parents' home. The DCF social worker testified, however, that Kristina's sobbing and silence surrounding visits continued through 1984. Counselors at the program explained to the DCF that nightmares, bedwetting, crying, and anger were all common behaviors for a child in Kristina's position. The program representative testified that balanced meals were served in Kate's home and that the bonding relationship between Kristina and her parents had greatly improved. The home was described as relatively clean, although somewhat disordered.

Prior to its recommending reunification, a program representative investigated an incident involving the removal of Kate's two sons from the home. The separation was a short one, and the investigation produced nothing of significance. Testimony was also presented through a program representative relating to Kristina's father's temper. The representative testified that she had observed the father strike his two sons on several occasions. The program suggested to Kate that Kristina's father

might benefit from participation in the Brother to Brother program. The program representative did not recall speaking directly with the father about his temper and did not know whether the father attended Brother to Brother.

In spite of its recommendation of reunification, the program agreed with the DCF that Kristina should be evaluated by an impartial examiner. A child psychologist, Dr. Brian Hayden, examined Kristina on August 7, 1984, and again on October 25, 1984.[2] Doctor Hayden also arranged to see Kristina's natural parents on August 8 and 14, 1984, to aid him in his evaluation and recommendation of future placement. The program provided the doctor with a history of its involvement, which included a favorable evaluation of the parents and their willingness to cooperate. Kristina was now five years old and was found to be basically insecure, fearful, and anxious and to have problems with personal relationships. During her first visit, she made it clear to the doctor that she was extremely attached to her foster parents and did not completely understand why she was being reunited with her natural family. Doctor Hayden observed the interaction between Kristina and her parents and noted plenty of physical contact and affection. He later realized, he testified, that Kristina's display of affection was not sincere and was more the result of being caught in the middle of two families and wanting to please both. Doctor Hayden's diagnosis stated that Kristina was bonded to her foster parents with no tangible signs of attachment to her natural parents. She was confused and vulnerable and wanted someone else to decide her fate. In light of the plans for reunification, Dr. Hayden recommended in August 1984 that since Kristina needed more time for adjustment, final reunification should be postponed.

Doctor Hayden reevaluated Kristina in October 1984. The child made it clear that she wanted to remain with her foster parents. As a result of this session Dr. Hayden felt that the prognosis for future bonding with the natural parents was poor. Although he found the natural parents to be well-meaning and caring, with their daughter's best interests at heart, he felt that if Kristina had not yet bonded with them, she probably would not bond with them in the future. Doctor Hayden felt it was this lack of bonding, rather than the natural parents' parenting abilities, that presented the biggest barrier to reunification.

The intensive phase of the program is followed by participation in parental-support groups aimed at easing the transition of the child into the home. Although Kristina was not returned to her home, Kate chose to attend these followup sessions. Kate does not recall regular visits once the program ended. She called the caseworker in May 1985, however, and asked to see her daughter. She testified that if the caseworker's schedule permitted, she was allowed to see her daughter under supervised conditions. Kate also testified that she asked if she could attend counseling with Rhode Island Youth Guidance once Kristina was returned. In March 1985 the parents were discharged from the program.

The DCF filed a petition to terminate parental rights in January 1985. The Family Court heard testimony on the petition from May through July 1985, when a decision was rendered. The trial justice stated that the interest of the child outweighs all other considerations and granted the petition. In November 1985 a hearing was held on the DCF's motion to terminate visitation rights. Doctor Hayden again testified for the DCF, stating that relying on the results of an August 6, 1985 session with Kristina, he felt that ongoing visitation with Kristina's natural family "would devastate this child's view of people's honesty and her sense of trust in the future."

2. In addition to the evaluations discussed in this opinion, a number of other evaluations are mentioned in the record. Although we do not discuss each evaluation individually, we believe we have addressed the relevant findings.

Continued visitation, he went on, would have a detrimental effect on Kristina's development. The trial justice then granted the DCF's motion to terminate visitation rights.

■ We disagree with the trial justice on both the decision to terminate parental rights and the decision to discontinue visitation. The decision to terminate parental rights involves a balancing of three interests, those of the state, the child, and the natural parents. *In re Kenneth*, 439 A.2d 1366, 1369 (R.I.1982). The hearing to terminate pits the interest of the state against the interest of the natural parents. *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388, 1398, 71 L.Ed.2d 599, 610 (1982). At the initial stage of the hearing, the state should not presume that the natural parents and the child are adversaries. *Id.* at 760, 102 S.Ct. at 1398, 71 L.Ed.2d at 611. Stated simply, G.L.1956 (1981 Reenactment) § 15–7–7(c), as amended by P.L. 1984, ch. 204, § 3 requires the state to prove, after the child has been in the care of a child-placement agency for six months, that it made reasonable efforts to reunite the family and that it is improbable in the foreseeable future that the child will be returned to the home owing to conduct or conditions unlikely to change.[3] Once these statutory requirements of proof are met,

the court may then assume, at the dispositional stage of the proceeding, that the interests of the child may not coincide with those of the parents. *Santosky*, 455 U.S. at 760, 102 S.Ct. at 1398, 71 L.Ed.2d at 611. As stated by the United States Supreme Court "[I]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551, 558–59 (1972) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645, 652 (1944)). It is clear, therefore, that "until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." *Santosky*, 455 U.S. at 760, 102 S.Ct. at 1398, 71 L.Ed.2d at 611. "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Id.* at 753, 102 S.Ct. at 1395, 71 L.Ed.2d at 606. In fact, the Court has held that it has "little doubt that the Due Process Clause would be offended '[i]f a State

---

**3.** General Laws 1956 (1981 Reenactment) § 15–7–7, as amended by P.L.1984, ch. 204, § 3 states, in pertinent part:

"Termination of parental rights.—The court shall, upon a petition duly filed after notice to the parent and hearing thereon, terminate any and all legal rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child if the court finds as a fact that:

\*　\*　\*　\*　\*　\*

(c) The parent has or has had a child in the care of licensed or governmental child placement agency, either voluntarily or involuntarily, for a period of at least six (6) consecutive months and the court further finds that the integration of the child into the home of the parent is improbable in the foreseeable future due to conduct or conditions not likely to change. The court shall review the initial conduct or conditions which caused the child to come into the care of the licensed or governmental child placement agency and deter-

mine whether there has been a change in the circumstances of the parent. In determining such conduct or conditions the court shall consider the lack of a good faith effort of the parent over a continuous period of six (6) months after placement to adjust his circumstances, conduct or conditions to make the return of the child possible or the failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such an extended duration of time that it appears reasonable that no lasting adjustment can be affected.

\*　\*　\*　\*　\*　\*

In considering the termination of rights as aforesaid, the court shall give primary consideration to the physical, psychological, mental and intellectual needs of the child insofar as that consideration is not inconsistent with other provisions of this chapter. The standard of proof shall be by clear and convincing evidence."

were to attempt the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.'" *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 555, 54 L.Ed.2d 511, 520 (1978) (quoting *Smith v. Organization of Foster Families,* 431 U.S. 816, 862–63, 97 S.Ct. 2094, 2119, 53 L.Ed.2d 14, 47 (1977) (Stewart, J., concurring)). Absent a finding that the parents are unfit, the state's interest in caring for the child is *"de minimis."* 434 U.S. at 248, 98 S.Ct. at 551, 54 L.Ed.2d at 515 (quoting *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)).

We acknowledge that we have not previously used the term "unfit" when describing the finding required before parental rights may be terminated. Prior interpretations of § 15–7–7(c) have made it clear, however, that unless the child "is likely to suffer physical and/or emotional harm, there is no reason to disturb the basic security of a family relationship." *In re Lester,* 417 A.2d 877, 880 (R.I.1980) (quoting *In re Jonathan,* 415 A.2d 1036, 1039 (R.I.1980)). The best interest of the child outweighs all other considerations once the parents have been adjudged unfit. In essence a finding of parental unfitness is the first necessary step.

■ At trial, the state failed to prove, nor did the trial justice find, that Kristina's parents were unfit. Neither did the trial justice find that Kristina was likely to suffer physical and/or emotional harm if she was returned to her family. Instead, the trial justice found that Kristina was bonded to her foster parents and not to her natural parents. In addition, though the DCF's expert could not testify that Kristina would not bond with her parents at some future time; the trial justice found such future bonding improbable since it had not yet occurred. The trial court also found that the natural parents did not cooperate with the DCF's efforts, which efforts were found to be reasonable.

On review the trial justice's findings of fact will not be disturbed unless they are clearly wrong or unless the justice overlooked or misconceived material evidence. *In re Kenneth,* 439 A.2d at 1369. Our review of the record before us leads us to the conclusion that the trial justice in this instance was clearly wrong.

When Kristina failed to gain weight as an infant, Kate acted responsibly and brought her child to three different hospitals in an attempt to help her child. Her care and concern resulted in a loss of her daughter for better than six years. Kate participated in counseling at the Pawtucket Mental Health Center soon after DCF recommended it. She also attended a STEP parenting program, another DCF referral. It is not surprising that she would feel frustration and hopelessness as time went on without the return of her child. It was not until another impartial party, the program, became involved in the case that the natural parents again took an active role in the task of reunification. Counselors from the program praised the efforts of the parents and cited instances in which they went beyond what was required of them. Yet, even in light of the program's recommendation of reunification, the DCF failed to return the child.

Kristina has spent her entire life, save approximately her first six months, with her present foster family. The visitation schedule, for the most part, appears totally inadequate. It is not surprising, then, that the child would develop deep emotional ties to her foster family. In a sense, the foster family has become Kristina's psychological family. The evidence shows that once attempts at reunification were intensified through the Kent County Mental Health Reunification Program, Kristina demonstrated marked improvement in her ability to relate to her natural parents. It is not uncommon that a child in Kristina's position would suffer stress and rebel against a change in a living situation with which she was extremely satisfied. In fact, the testimony revealed that Kristina's physical reactions to the reunification efforts, which

included vomiting, crying, and nightmares, were not unusual for a child in her position.

This court, along with the Legislature, has often recognized the duty of the DCF to make reasonable efforts to encourage and strengthen the parental relationship before a termination of rights is effected. *In re Ann Marie*, 461 A.2d 394, 395 (R.I. 1983) (citing *In re William, Susan, and Joseph*, 448 A.2d 1250, 1255 (R.I.1982)); § 15–7–7(c). Determination of what is "reasonable" in a given case must be made in light of its particular facts and circumstances. *In re Ann Marie*, 461 A.2d at 395. We do not find the efforts of the DCF in this case to have been reasonable. The visitation schedule for Kristina was insufficient at best and sometimes nonexistent. Many visits were canceled because no one was available from the DCF to transport Kristina or because of car troubles. Kristina has been kept from her family for better than six years for reasons that include dirty dishes, dirty laundry, and an "awkwardness" between mother and child. In spite of the alleged unacceptable condition of Kate's home and her lack of parenting abilities, the DCF never found it necessary to remove Kate's other two children from the home.

The strongest testimony in support of the state's case comes from Dr. Brian Hayden during the hearing on the state's motion to terminate visitation rights. This hearing was held nearly four months after parental rights had been terminated. Doctor Hayden's testimony revealed the results of an evaluation he made of Kristina on August 6, 1985, nearly one month after parental rights had been terminated. The doctor stated that he had no reason to believe that Kristina's visits with her parents up to the time of his evaluation had had a detrimental effect on the child's emotional development. Notwithstanding this belief, he testified that continued visitation with the natural parents would have a detrimental effect. At the time of his evaluation, the doctor felt that Kristina had completely identified with her foster family. She was under the impression that she had

seen her natural parents for the last time, that she would no longer have to visit them, and that her foster parents were going to adopt her. Clearly, Kristina's impressions and beliefs regarding her future placement cannot be separated from Dr. Hayden's assessment. As tragic as it is that Kristina was led to believe an uncertainty, reality remains. The natural parents had not been found unfit; therefore, the child's best interest cannot be triggered.

Parental unfitness and the best interest of the child are not unrelated concepts. Concern for the best interests of the child is "not inconsistent with a respect for parental rights with which no agency of the state may interfere on arbitrary or irrational grounds." *In re David*, 427 A.2d 795, 801 (R.I.1981) (citing *In re Jonathan*, 415 A.2d 1036, 1039 (R.I.1980)). The inability of parents to provide the basic necessities of life for their children is certainly not in the child's best interest. However, even though it may be in a child's best interest to live with a family of comfortable means rather than a poorer family, this standard may not justify the state's intervention into a family relationship absent a finding of parental unfitness.

The DCF, through its workers, has the duty of walking a fine line between respecting the sanctity of the right to bear and raise children and protecting a potentially abused or neglected child. It is an awesome responsibility, one that must be undertaken with an overall deep respect for the family's right to privacy. The workers must take care not to impose their own values regarding proper familial relationships on the families they meet in the course of their work. " 'Only if the caseworker is mature enough and trained enough to respect even [less than perfect] parents and to balance the less-evident long-term considerations against the manifest and perhaps urgent short term ones, will [he or] she help the parents themselves and do a good turn to the child.' " Areen, *Intervention Between Parent and Child:*

A *Reappraisal of the State's Role in Child Neglect and Abuse Cases*, 63 Geo. L.J. 887, 914 n. 155 (1975). Absent a finding of unfitness, the natural parents' right to bear and raise their child in a less than perfect way remains superior to the rights of foster parents who may be exemplary nurturers. *See Smith v. Organization of Foster Families*, 431 U.S. 816, 845–46, 97 S.Ct. 2094, 2110, 53 L.Ed.2d 14, 35–36 (1977).

This case is a very difficult one. The problem appears to belong to the system, yet it is Kristina, the innocent victim, and her two families who must suffer the consequences. The state owes these victims the best in social-service support that it can provide. Reunification will be difficult, at best, for all involved, and provisions must be made to ease the transition for everyone concerned. The foster family has earned a special place in Kristina's life, and its role cannot be forgotten. It should continue to be a part of the child's life. The Family Court will oversee the transition period, directing the involvement of appropriate agencies.

For the above-stated reasons, the appeal is sustained, the judgment of the Family Court is reversed, and the papers of this case are remanded to the Family Court so that it may oversee the reunification of this family over the period of time needed by all concerned.