**In re CHRISTOPHER B. et al.**

**No. 2001–150–M.P.**

Supreme Court of Rhode Island.

May 30, 2003.

Thomas J. Corrigan, Jr., Providence, Frank J. Iacono, Jr., for Plaintiff.

Catherine A. Gibran, Paula Rosin, Providence, for Defendant.

Present: WILLIAMS, C.J.,
FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

This is a consolidated case involving a mentally deficient mother's appeal from a Family Court decree terminating her parental rights (TPR) to two of her children. It also involves a petition for certiorari filed by the Department of Children, Youth and Families (DCYF) concerning whether DCYF must obtain court permission to end visitation between a parent and his or her children during the pendency of the parent's appeal from a TPR decree vis-à-vis those children. In her appeal from this TPR decree, the mother suggests that, before DCYF filed a TPR petition against her, it failed to make reasonable efforts "to encourage and strengthen the parental relationship so that the child[ren] can safely return to the family." G.L.1956 § 15–7–7(b)(1). The mother also argues that DCYF failed to offer her—nor did she otherwise receive—"services to correct the situation which led to the child[ren] being placed." Section 15–7–7(a)(3).

For the reasons explained below, we hold that even though DCYF failed to make reasonable efforts to address the mother's mental deficiencies and to improve her parenting skills, it did provide her with services to correct the relationship and parenting problems she faced as a result of her involvement with sexually and physically abusive men. Consequently, because this was an important factor in the situation that led to the placement of

her children, we affirm the TPR decree and deny and dismiss the mother's appeal. We also deny the petition for certiorari as moot because the Family Court ultimately refused to allow the mother to have visitation with her children during her appeal from the TPR decree.

### Facts and Travel

On July 28, 1998, DCYF sent an investigator to the home of the respondent mother, Mary Ann R. (mother or Mary Ann) and her husband, Dennis R. (father or Dennis), in response to a hotline call concerning their children, Christopher B., then age five, and Kayla R., then age three.[1] Upon entering the home, the investigator discovered that it was filthy, that it reeked of an offensive animal odor, and that it contained two dirty children, covered with multiple bruises. Based upon these observations, the investigator arranged for the children to be removed from their home and taken to Memorial Hospital of Rhode Island in Pawtucket, where a physician examined the children and placed them under a seventy-two-hour hold. Three days later, on July 31, 1998, the Family Court placed the children in temporary DCYF custody. After the mother's dependency admission on April 6, 1999, the court committed the children to DCYF's care, custody, and control.

Within a brief period after the court first placed the children in temporary protective custody, DCYF referred both Mary Ann and Dennis for limited services that it generally offers to families with children under agency placement, such as supervised visitation through the Families Together Program at the Providence Children's Museum.[2] After DCYF had separated the children from their parents for several months, DCYF referred Mary Ann for two different types of evaluations: first, a psychological evaluation by Dr. John Parsons, Ph.D., and second, a "comprehensive parent evaluation" by Pauline Santos, MSW, at the Spurwink RI, a facility that assists parents such as Mary Ann with their cognitive limitations. Doctor Parsons discovered that Mary Ann suffered from a mild form of mental retardation, with an I.Q. of 66 "which [is] equivalent to a percentile rank of less than one." In light of her limited cognitive abilities, both evaluators concluded that Mary Ann required specialized services if she were to have any chance of achieving reunification with her children. Specifically, they recommended that the mother receive specialized parenting education; that she obtain independent counseling apart from and in addition to marriage counseling; and that she would benefit only from services that implemented a cognitive behavioral approach. Both evaluators expressed concerns that, given Mary Ann's mental impairment, even the comprehensive provision of all recommended services still might not prepare her sufficiently for reunification to occur. Nevertheless, both evaluators recommended that Mary Ann receive services aimed at achieving reuni-

1. Dennis R. is the natural father of Kayla R. and the stepfather of Christopher B. By the time of the trial in this case, the Family Court already had terminated Dennis R.'s parental rights to his daughter Kayla in a separate proceeding. Likewise, it also had terminated the parental rights of Christopher's natural father, Richard L., in a separate proceeding. Neither father challenged these Family Court TPR decrees on appeal.

2. Although DCYF argued that Families Together was a parenting-education program, the Family Court trial justice disagreed, finding that although the enhanced visitation program "provides a parenting skills component," the program was "essentially a visitation program" which "in no [way] substitute[d] for * * * specialized parenting classes."

fication with her children, suggesting that she be given the opportunity to demonstrate her parenting abilities before DCYF initiated TPR proceedings.

Significantly, DCYF failed to abide by these recommendations. Thus, it made no additional referrals for Mary Ann other than for marriage counseling; it offered her no services aimed at specialized parenting education over the next year—other than her continued participation in the supervised visitation program at the Children's Museum.[3] In addition, although advised of Mary Ann's cognitive impairment and that its presence was a barrier to reunification, DCYF took no steps to provide Mary Ann with any form of specialized services aimed at addressing this problem. Meanwhile, DCYF provided abundant services for the two foster-care families with whom it placed Christopher and Kayla, including months of intensive, specialized training sessions aimed at parenting special-needs children. Not surprisingly, in light of the special services provided, the foster-care relationships blossomed while Mary Ann's relationship with her children languished.

On February 3, 2000, pursuant to § 15–7–7(a), DCYF petitioned the Family Court for a TPR decree with respect to both Mary Ann and Dennis. As grounds for Mary Ann's TPR, DCYF initially relied on three separate statutory bases: § 15–7–7(a)(2)(i), citing Mary Ann's alleged mental deficiency;[4] § 15–7–7(a)(3), based on the children's placement "in the legal custody or care of [DCYF] for at least twelve (12) months;" and § 15–7–7(a)(2)(iii), alleging Mary Ann's chronic substance abuse.[5]

---

**3.** On August 5, 1998, DCYF assigned Evelyn Veloz–Rocheleau as the parents' caseworker. Veloz–Rocheleau testified that, on August 28, after being assigned to the family, she referred Mary Ann and Dennis to the Blackstone Valley Community Action Program for parenting education classes, which neither parent attended. When questioned about this referral at trial, however, Veloz–Rocheleau could not remember whether she ever informed Mary Ann or her husband that DCYF had made this referral. According to Mary Ann, she never knew about this referral.

**4.** On June 30, 2000, only months after DCYF filed its TPR petition against Mary Ann, the General Assembly amended G.L.1956 § 15–7–7(a)(2)(i), by deleting the former language in it that allowed a finding of parental unfitness to be based on "[e]motional illness, mental illness, mental deficiency, or institutionalization" of the parent. It revised the statute to include only a finding of "[i]nstitutionalization" as a prerequisite for termination under § 15–7–7(a)(2)(i). *See* P.L.2000, ch. 69, § 1. Because this amendment by its terms applies only to TPR petitions filed on or after July 1, 2000, and because DCYF filed its TPR petition against Mary Ann on February 3, 2000, we consider this petition under the subsection's previous language, which includes "mental deficiency" as a ground for termination.

**5.** Before it was amended by P.L.2000, ch. 69, § 1, § 15–7–7(a) provided, in pertinent part:

"**Termination of parental rights.**—(a) The court shall, upon a petition filed by a governmental child placement agency or licensed child placement agency after notice to the parent and a hearing on the petition, terminate any and all legal rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child, if the court finds as a fact by clear and convincing evidence that:

\* \* \*

(2) The parent is unfit by reason of conduct or conditions seriously detrimental to the child, such as, but not limited to, the following:

(i) Emotional illness, mental illness, mental deficiency, or institutionalization of the parent, including imprisonment, of such a duration as to render it improbable for the parent to care for the child for an extended period of time;

\* \* \*

(iii) The child has been placed in the legal custody or care of [DCYF] and the parent has a chronic substance abuse problem and the parent's prognosis indicates that the child will not be able to return to the custody of the parent within a reasonable

After eight days of hearings, the Family Court issued a written decision terminating Mary Ann's parental rights with respect to both children. It based its decision on two of the three grounds invoked by DCYF: § 15–7–7(a)(2)(i) and (a)(3). Although DCYF included allegations of substance abuse in the complaint, it did not pursue this ground during the trial; thus, the Family Court justice dismissed this claim for lack of evidence.[6] Although the trial justice found that DCYF had failed to provide her with mental-health services that would help her to reunite with her children and that DCYF "never even offered [Mary Ann] services which would have been the most appropriate to her cognitive level of functioning," he went on to find, nevertheless, that "there [was] little or no evidence suggesting that [Mary Ann] has the capacity to become a more effective parent even if all the recommended services were to be provided to her." Based on this finding of Mary Ann's limited mental capacity and on his determination that a TPR decree was in the best interests of the children, the trial justice ruled that "the [family] court is *compelled* to conclude that DCYF did make reasonable efforts to encourage and strengthen the parental relationship given the totality of the circumstances." (Emphasis added.) As a result, the trial justice granted DCYF's petition and issued a TPR decree against Mary Ann.

While Mary Ann's appeal to this Court was pending, but after the Family Court granted DCYF's TPR petition, DCYF unilaterally suspended Mary Ann's visitation rights with her children, Christopher and Kayla. DCYF did so without seeking permission from the Family Court to suspend these visits. Rather, DCYF proceeded on the assumption that the Family Court TPR decree necessarily included a determination that the mother was an unfit parent and that her parental right of visitation ended upon the entry of the TPR decree, thereby extinguishing as a matter of law any previous Family Court visitation orders that may have existed before the entry of the TPR decree. Mary Ann moved the Family Court to compel compliance with the visitation order that had been in effect before and during the termination proceeding, arguing that § 15–7–7(b)(2) guaranteed her right to continued visitation pending her appeal to this Court. Section 15–7–7(b)(2) provides that the various statutory grounds for terminating parental rights "shall not be construed and [are] not intended to limit or affect in any way the parents' right to see or visit the child during the pendency of a petition under this section." After a hearing, the Family Court agreed with Mary Ann and granted her motion to compel visitation, ruling that a petition to terminate parental rights remained "pending" until this Court decided the mother's appeal and that any previous visitation order would remain in effect until DCYF moved for and obtained relief from such an order during the pen-

period of time, considering the child's age and the need for a permanent home.
* * *
(3) The child has been placed in the legal custody or care of [DCYF] for at least twelve (12) months; and the parents were offered or received services to correct the situation which led to the child being placed, and provided further that there is not a substantial probability that the child will be able to return safely to the parents'

care within a reasonable period of time considering the child's age and the need for a permanent home."

6. The trial justice found that DCYF failed to meet its burden to prove substance abuse under § 15–7–7(a)(2)(iii), concluding that "the record lacks any evidence that mother has a substance abuse problem, much less a chronic problem, that would cause her to be an unfit parent."

dency of the parent's appeal. Thereafter, DCYF moved the Family Court to terminate Mary Ann's visitation with the children while her appeal was pending, arguing that visitation was not in the best interests of the children. The Family Court granted this motion, and Mary Ann did not appeal from or seek other relief with respect to that order. Thus, she has not visited with the children while this appeal was pending.

Seeking to resolve whether a TPR petition remains pending during an appeal from such a decree or whether DCYF still must obtain Family Court permission to suspend visitation after the Family Court has entered a TPR decree but while an appeal from such a decree is pending, DCYF petitioned this Court for a writ of certiorari to review the Family Court's initial order requiring visitation to continue during the appeal. We issued the writ and consolidated the mother's appeal with DCYF's petition. Thus, we address the issues raised by both matters in this opinion.

## I

## Termination of Parental Rights

■ The trial justice granted DCYF's TPR petition under § 15–7–7(a)(2)(i) and (a)(3). As required by § 15–7–7(a) and (b)(1), and as we previously have held, these statutory bases for a TPR decree require not only that the child-placement agency prove each basis alleged for termination by clear and convincing evidence, but also that any ground for a TPR decree has continued to exist "notwithstanding the reasonable efforts which shall be made by the agency prior to the filing of the petition to encourage and strengthen the parental relationship so that the child can return safely to the family." Section 15–7–7(b)(1) (imposing such a requirement statutorily for § 15–7–7(a)(2)(i)); *see also*

*In re Joseph S.,* 788 A.2d 475, 477–78 (R.I.2002) (holding that "the department is required, pursuant to § 15–7–7(a)(3), to make reasonable efforts to strengthen the parental relationship until a termination petition is filed pursuant to § 15–7–7(b)(2)"). After such an evidentiary showing and an adjudication of unfitness, the inquiry then shifts to the "best interests of the child." *See In re Nicole B.,* 703 A.2d 612, 615 (R.I.1997). "[T]he primary step before any termination of parental rights is that there be a finding of parental unfitness. Once this fact is established, the best interests of the child outweigh all other considerations." *In re Kristen B.,* 558 A.2d 200, 203 (R.I.1989).

■ When reviewing a Family Court TPR decree, we accord the justice's findings great weight, and will not disturb that decision "absent a showing that the trial justice was clearly wrong or that material evidence was overlooked or misconceived." *In re Raymond C.,* 751 A.2d 281, 282 (R.I.2000) (per curiam) (quoting *In re Nicole B.,* 703 A.2d at 615). As a result, "we examine the record to determine whether any legally competent evidence exists to support the trial justice's findings." *Id.* (quoting *In re Kelly S.,* 715 A.2d 1283, 1288 (R.I.1998)). Below, we discuss the separate grounds that the trial justice relied upon to terminate the mother's parental rights.

### A. Termination under § 15–7–7(a)(2)(i) (Mental Illness)

■ Before the Family Court could terminate a parent's rights under § 15–7–7(a)(2)(i), as the statute existed before the General Assembly amended this law by P.L.2000, ch. 69, § 1, the child-placement agency bringing the petition first had to prove, by clear and convincing evidence, that the parent suffered from a serious

mental illness or deficiency and that this condition was of such a duration that it "render[s] it improbable for the parent to care for the child for an extended period of time." Section 15–7–7(a)(2)(i); *see also In re Joseph S.*, 788 A.2d at 477.

Here, the trial justice found that DCYF had satisfied this standard of proof with regard to Mary Ann, finding that she suffered from "mild mental retardation with dependent and self-defeating features." Relying on Dr. Parsons' testimony and her psychological evaluation of Mary Ann, the trial justice found that Mary Ann exhibited extremely limited cognitive skills, displaying a full-scale I.Q. of 66 and reading ability at a third-grade level. In addition, the trial justice found that Mary Ann was "an extremely defensive and dependent individual," "lack[ing] insight and exhibit[ing] poor judgment," and that she relied heavily on other individuals for personal guidance and support. The trial justice found that these psychological and personality traits significantly impaired Mary Ann's ability to care for her children effectively, and as a result "that it [was] indeed improbable that [Mary Ann] will be able to care for them for an extended time."

Mary Ann does not contest these findings on appeal. Rather, she disputes the trial justice's finding that DCYF employed reasonable efforts to encourage and strengthen her parental relationship in light of her cognitive impairment. When, as here, the law required DCYF to employ reasonable efforts to encourage and strengthen the parental relationship, a finding of reasonable efforts on the part of DCYF is a necessary precondition for a finding of parental unfitness, and a prerequisite to the granting of a TPR decree. *See* § 15–7–7(b)(1); *In re Brianna D.*, 798 A.2d 413, 415 (R.I.2002) (per curiam); *In re Kristen B.*, 558 A.2d at 203. As we previously have held, "[t]he issue of the reasonableness of the department's efforts must be determined from the 'particular facts and circumstances of each case.' " *In re Joseph S.*, 788 A.2d at 478 (quoting *In re Kristen B.*, 558 A.2d at 203 and citing *In re Ann Marie*, 461 A.2d 394, 395 (R.I. 1983)). Most importantly for this case, "[e]fforts to encourage and strengthen the parental relationship which are reasonable with respect to an average parent are not necessarily reasonable with respect to an intellectually limited person * * *." *In re William, Susan, and Joseph*, 448 A.2d 1250, 1255 (R.I.1982). In addition, we have observed that, "consistent with a 'totality of the circumstances' approach," the efforts required from DCYF to satisfy the reasonable efforts standard "vary with the differing capacities of the parents involved." *Id.* at 1256.

As the trial justice noted, before the mother's psychological and parenting evaluations, DCYF referred Mary Ann to two programs. First, DCYF referred Mary Ann and her husband to the Blackstone Valley Community Action Program for parenting-education classes. Second, it referred them to the Families Together program at the Children's Museum for "enhanced" supervised visitation. At trial, Mary Ann's caseworker, Veloz–Rocheleau, testified that she made an initial referral for them to attend parenting-education classes at the Blackstone Valley program. She said that she arranged for Mary Ann and Dennis to attend classes there beginning in mid August—September 1998. But she could not remember whether she actually informed Mary Ann of this referral. Both this referral and the later counseling appointment occurred within at most three weeks of the date that DCYF originally removed Christopher and Kayla from their parental home. Besides this initial referral, Veloz–Rocheleau said she made no other referrals for parenting edu-

cation—other than whatever was incidental to the visitation program offered through the Children's Museum.

On January 30, 1999, Dr. Parsons completed his psychological evaluation of Mary Ann. Although he expressed doubt that Mary Ann ever would be able to parent her children safely and independently in light of her limited cognitive functioning and lack of assertiveness, his report included the following findings and recommendations for services:

"Intensive in-home services will be necessary for the foreseeable future. If she has not already done so, specialized parenting classes would be helpful.

* * * [Mary Ann] should involve herself in a period of counseling to help her deal with her problems of adjustment. This woman will not profit from insight oriented treatment but is in need of a cognitive behavioral approach to help her deal with her distorted perceptions." [7]

One month later, on March 23, 1999, Ms. Santos completed her parenting assessment. As a result of her assessment, she made the following findings and recommendations to DCYF:

"Maryann [sic] and Dennis should be afforded a final opportunity to demonstrate their collective ability to parent their children. In order to guaranty the children's safety, however, the only scenario under which I can see these children being returned to these parents is if this family is offered and agrees to accept, a comprehensive assortment of wrap-around services to include [but not necessarily limited to]:

1. A combination of individual and marital counseling for both adults[;]

2. Parenting classes and/or in-home parenting training for both adults;

3. Dennis' participation in an abuser's group[;]

4. Maryann's [sic] participation in a non-offenders' group; and

5. Continued services of an education advocate for Christopher and Kayla.

Christopher and Kayla should remain in placement until these services can be put into place. The situation should then be reassessed six months from the inception of those services."

Significantly, the trial justice found that DCYF made no new referrals based on these recommendations over the next year, other than for marriage counseling. Thus, despite two assessments recommending specialized referrals for Mary Ann in light of her cognitive impairment and parenting difficulties, the only services DCYF offered to Mary Ann after her evaluations were marriage counseling and continued participation in the visitation program at the Children's Museum. But neither of those referrals was designed to address Mary Ann's mental disability nor to assist her in developing basic parenting skills.

In the trial justice's written decision, he observed, "[u]nless we are prepared to say that a mentally retarded individual is by definition incapable of parenting—which is clearly not the case—[Mary Ann] is entitled to receive appropriate services." As

7. Although Dr. Parsons expressed "concerns" about Mary Ann's capacity to become an effective parent, and "doubts" about her ability to retain information without intensive, personalized instruction, he did not testify that, to a reasonable degree of professional certainty, Mary Ann's cognitive limitations rendered her incapable of parenting. In fact, as the trial justice observed, "no one * * * suggested that [Mary Ann's mental] health status, in and of itself, prevents her from becoming an effective parent." On the contrary, Dr. Parsons emphatically testified that Mary Ann's I.Q., in-and-of-itself, did not prevent her from becoming an effective parent.

the trial justice noted, DCYF created five different case plans for Mary Ann, all of which it supposedly aimed at reunification. But the only services that DCYF offered or that Mary Ann received as a consequence of these different plans consisted, in the following order, of: (1) a referral to the Blackstone Valley Community Action Program in August of 1998 for parenting education, (which Mary Ann says that DCYF never told her about and DCYF could not recall telling her about); (2) a referral to the Families Together Program at the Children's Museum for biweekly and then weekly supervised visitation, which Mary Ann attended, beginning in January 1999; (3) a referral to Dr. Parsons for a psychological evaluation, completed on January 30, 1999; (4) a referral to Pauline Santos at the Spurwink RI for a parenting evaluation, completed on March 23, 1999; and (5) a referral to Robin Boyajian at Spurwink for marriage counseling and couples therapy, originally made in April of 1999, which Mary Ann attended. Thus, as this time line illustrates, the only additional referrals DCYF made in response to the two evaluators' recommendations was marriage counseling and couples therapy, which the trial justice found to be "incongruous" under the circumstances.[8]

The trial justice found that DCYF received Dr. Parsons' psychological evaluation in February 1999, and thus "was made aware * * * fully one year prior to the filing of the termination petitions, that [Mary Ann] was mildly retarded and could benefit from specialized parenting classes and counseling utilizing a cognitive behav-

ioral approach as distinguished from insight oriented treatment." In addition, the trial justice noted that DCYF had not argued that the services that Dr. Parsons and Ms. Santos recommended for Mary Ann were unavailable. He also found as a fact that DCYF "simply never made any referrals pursuant to the recommendations other than to marriage counseling." After evaluating the services provided by DCYF, the Family Court justice made the following findings:

"Clearly DCYF did not exert its best efforts to strengthen this family relationship, nor did it offer [Mary Ann] the most appropriate services in light of her limited cognitive functioning. Clearly it should have done much more in the year between the receipt of Dr. Parsons' evaluation and the filing of the termination petition.

"Yet by the same token there is little or no evidence suggesting that [Mary Ann] has the capacity to become a more effective parent even if all of the recommended services were to be provided to her.

"* * *

"It is the duty of this court in considering a termination petition to consider the interests of the parent, the child and the state. In doing so, the court is mindful of the urgent need of these children for permanency in their lives. Therefore, the court is *compelled* to conclude that DCYF did make reasonable efforts to encourage and strengthen the parental relationship given the totality

---

8. Dennis was incarcerated at the Adult Correction Institutions (ACI) in May 1999, based on charges that he sexually abused two other children. After discovering this, Mary Ann told her marriage counselor that she wanted to divorce Dennis because she believed that he had sexually abused her children as well and that she considered him an obstacle to

her reunification with the children. Although divorce papers were prepared for Mary Ann to sign, and even though Mary Ann testified at trial that she no longer was living with Dennis, Mary Ann still had not actually filed suit to divorce Dennis as of March 31, 2003, the date when the parties orally argued this case to us.

of the circumstances." (Emphasis added.)

Thus, based on the trial justice's conclusion that "little or no evidence" suggested Mary Ann was capable of benefiting from the recommended services that DCYF never offered to her, and on his conclusion that termination was in the best interests of the parents, the children, and the state, the trial justice found that he was "compelled to conclude" DCYF had employed reasonable efforts at reunifying the family.

Mary Ann, of course, challenges this conclusion on appeal, arguing that the trial justice improperly based his finding of reasonable efforts on his conclusion that no amount of reasonable efforts to provide her with appropriate services could have benefited Mary Ann to the point at which reunification with her children would be possible. Mary Ann argues that no evidence supports this finding and that even if it were true, it does not excuse DCYF from its statutory duty to employ reasonable efforts to "encourage and strengthen the parental relationship," as required by § 15–7–7(b)(1). Mary Ann also argues that, although the services DCYF offered her might be reasonable for a parent of average intelligence, such services were unreasonable for a person such as herself who was incapacitated by a mental deficiency.

When alleging a parent's mental illness or deficiency as a basis for terminating parental rights, DCYF bears a statutory burden of demonstrating to the Family Court that it engaged in reasonable efforts to reunify the family. *See* §§ 15–7–7(a)(2)(i) and (b)(1). We have held previously that when DCYF is required by statute to pursue reasonable efforts before filing for termination, it is required to do so "[r]egardless of the unlikelihood for success," *In re Joseph S.*, 788 A.2d at 477—at least when, as here, no expert testimony

supports the proposition that, to a reasonable degree of professional certainty, any such efforts would prove to be futile under the circumstances. We have also held that what constitutes reasonable efforts depends on the totality of the circumstances, including both the "particular needs" of a cognitively impaired parent and the availability of the suggested services through the child-placement agency. *See In re William, Susan, and Joseph,* 448 A.2d at 1256.

Here, the trial justice found that Mary Ann suffered from a relatively mild form of mental retardation, that Dr. Parsons and Ms. Santos recommended certain available services to strengthen Mary Ann's parental relationship with Christopher and Kayla, and that DCYF failed to refer Mary Ann for any of these available services, other than for marriage counseling. Further, the only other programs DCYF offered to Mary Ann either were never disclosed to her or not designed in any way to address her special parenting needs and cognitive limitations.

Nevertheless, instead of denying DCYF's petition because of these findings, the trial justice believed that he was "compelled" to conclude that DCYF had employed reasonable efforts in this case. Essentially, he found that Mary Ann was beyond hope of improving her parenting skills to the point at which reunification would be possible, and therefore the best interests of the children, the parents, and the state all favored terminating parental rights. The trial justice also commented that he felt "compelled" to reach such a conclusion in light of the totality of the circumstances, including most predominantly, the best interests of the children and "the urgent need of these children for permanency in their lives." Mary Ann, however, received no services designed to overcome her established cognitive impair-

ment. Thus, to hold that she would not benefit from services never attempted would be to adopt a rule that mentally impaired parents are *per se* incapable of parenting—a holding that even the trial justice said he wished to avoid.[9] *See* text, *supra.*

■ In addition, because a finding of reasonable efforts is a prerequisite to a finding of unfitness when such a showing is required by statute, *see In re Brianna D.*, 798 A.2d at 415, absent a finding of reasonable efforts, the balance of inquiry does not yet shift to the "best interests of the child." *See In re Nicole B.*, 703 A.2d at 615. As a result, the trial justice inappropriately conditioned his finding of reasonable efforts, and thus his determination of unfitness, on "the urgent need of [the] children for permanency in their lives." Although we have observed that this is an important consideration in determining the best interests of a child, *see In re Brianna D.*, 798 A.2d at 415, such an inquiry is inappropriate before a finding of parental unfitness occurs. *See id.* (holding that, in considering a petition to terminate parental rights, "[t]he first step is, therefore, a finding of parental unfitness. * * * [T]he next step is to consider the best interest of

the child, which will . [then] 'outweigh all other considerations.' ").

This Court has provided guidelines for what form of agency conduct constitutes "reasonable efforts" as defined in § 15–7–7(b)(1). In *In re William, Susan, and Joseph*, we held that the following standards, adopted from New York law, were helpful in determining whether a child-placement agency such as DCYF has made reasonable efforts to encourage and strengthen the parental relationship:

> " '[D]iligent efforts' shall mean reasonable attempts by an authorized agency to assist, develop and encourage a meaningful relationship between the parent and child, including but not limited to:
>
> (1) consultation and cooperation with the parents in developing a plan for appropriate services to the child and his family;
>
> (2) making suitable arrangements for the parents to visit the child;
>
> (3) provision of services and other assistance to the parents so that problems preventing the discharge of the child from care may be resolved or ameliorated; and

---

9. DCYF argues that we have endorsed such a position through our language in a recent case, *In re Michael B.*, 796 A.2d 467 (R.I. 2002) (per curiam). There, speaking of a termination brought pursuant to § 15–7–7(a)(3), we said that "[w]e are constrained to concur with the trial justice's assessment that no amount of effort on the part of DCYF was likely to enable these parents 'to change [their] conduct and to improve the conditions that caused [Michael] to enter DCYF care initially.' " *In re Michael B.*, 796 A.2d at 469 (quoting *In re John W.*, 682 A.2d 930, 932 (R.I.1996) (per curiam)). In *In re Michael B.*, however, the parents would not cooperate with DCYF, either because they completely refused to accept DCYF's proposed case plans, or because they refused to comply therewith. *See In re Michael B.*, 796 A.2d at

469. In addition, although the parents exhibited some mental-health problems, the primary factor that led to the child's placement in *In re Michael B.* was domestic violence. *See id.* (quoting the trial justice's finding in that case that by clear and convincing evidence "the biological parents are unfit by reason of conduct seriously detrimental to the child"). Here, the record reveals that Mary Ann cooperated with DCYF in attending programs when her caseworker informed her about them. For example, Veloz–Rocheleau testified that Mary Ann would regularly arrive as much as two hours early for supervised-visitation appointments with the children. Doctor Parsons and Ms. Santos also said that Mary Ann was fully compliant with them during the evaluations.

(4) informing the parents at appropriate intervals of the child's progress, development and health.'" *In re William, Susan, and Joseph,* 448 A.2d at 1257 n. 3 (quoting N.Y. Soc. Serv. Law § 384–b(f) (McKinney 1981)).

Because the trial justice found that Mary Ann's mental deficiency was directly related to the situation that led to the children's placement and because her mental health interfered with her ability to parent Christopher and Kayla effectively, we hold that DCYF, in petitioning for a TPR decree on mental-deficiency grounds, was required to demonstrate that it undertook reasonable efforts to address these mental-deficiency issues in the services it offered to this parent. Such a holding is consistent with our previous determination that reasonable efforts to reunify a family must in some way include an offer of services that would be reasonable under the particular circumstances of each given case—taking into account the particular needs of the subject family—including the mental deficiency of a parent. *See In re William, Susan, and Joseph,* 448 A.2d at 1255 ("Efforts to encourage and strengthen the parental relationship which are reasonable with respect to an average parent are not necessarily reasonable with respect to an intellectually limited person."). Because DCYF made no such showing of reasonable efforts to address Mary Ann's mental impairment in this case and because the trial justice misapplied the standards set forth above, we hold that the trial justice overlooked material evidence and was clearly wrong in his finding that DCYF undertook reasonable efforts under § 15–7–7(a)(2)(i) to reunify Mary Ann and her children. Indeed, we are unable to point to any legally competent evidence to support the trial justice's findings that termination was proper on the grounds of Mary Ann's mental deficiency. Thus, with respect to this particular ground for termi-nation, we sustain Mary Ann's appeal, reverse the trial justice's decision, and vacate the finding of parental unfitness and the TPR decree under this subsection because of DCYF's failure to undertake reasonable efforts to address Mary Ann's mental deficiency and its impact on her parenting skills.

**B. Termination under § 15–7–7(a)(3)**

 The trial justice also found that DCYF had sustained its burden of proof under § 15–7–7(a)(3), which requires the agency to show, by clear and convincing evidence, (1) that the children were placed in the "legal custody or care of [DCYF] for at least twelve (12) months," (2) that "the parents were offered or received services to correct the situation which led to the child being placed," and (3) that "there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time, considering the child's age and the need for a permanent home." Mary Ann does not contest the trial justice's findings that Christopher and Kayla were in DCYF custody for at least twelve months, or that, at the time of the trial, there was no substantial probability that the children would be able to return safely to their mother's home within a reasonable period. Mary Ann does challenge on appeal, however, the trial justice's determination that she was "offered or received services to correct the situation which led to the child[ren] being placed." Furthermore, Mary Ann argues that, although § 15–7–7(b)(1) is silent with regard to whether DCYF is required to show that reasonable efforts were made to correct the situation that led to the children's placement when DCYF brings a TPR petition under § 15–7–7(a)(3), such a requirement is imposed by implication from the applicable statutory language and by our previous case law.

Our review of the record reveals that the factors leading to Christopher's and Kayla's initial placement with DCYF included the following allegations of abuse and neglect: "That the parents * * * have failed to provide said child[ren] with a minimum degree of care, supervision or guardianship;" "[t]hat [parents] have inflicted or allowed to be inflicted upon the child[ren], physical injury, including excessive corporal punishment;" and "[t]hat [parents] have created or allowed to be created a substantial risk of physical injury to the child[ren]."

In his evaluation of these factors, the trial justice found:

"Clearly, the 'situation which led to the children being placed' with respect to [Mary Ann] is directly related to her mild mental retardation. Her limited cognitive abilities bring into question her capacity to parent effectively both Christopher and Kayla, and to provide them with a safe, clean and appropriate home. Coupled with her passive and dependent personality, *her intellectual limitations also create concerns with respect to her ability to protect her children from her abusive husband or other boyfriends.*" (Emphasis added.)

Thus, the record reveals that to achieve reunification with the children, Mary Ann needed to address two discrete—albeit related—problems that led to the children's initial placement: first, her need for basic parenting education in light of her limited cognitive abilities; and second, her need to address her abusive relationships with Dennis and the other men in her life, which were affecting adversely her ability to raise Christopher and Kayla in a safe environment. The trial justice did not make a finding that DCYF offered Mary Ann services designed to address her cognitive limitations and her need for basic parenting education. Likewise, he made no findings about whether Mary Ann was offered or received appropriate services to address her recurrent problems with abusive male relationships. Rather, the trial justice found that the only services DCYF offered or provided to Mary Ann in response to the evaluators' recommendations were marriage counseling and continued participation in supervised visitation at the Children's Museum. The trial justice found generally that these programs amounted to services "offered or received" to correct the situation leading to Christopher and Kayla's placement, consistent with § 15–7–7(a)(3). DCYF argues that it has satisfied its burden under § 15–7–7(a)(3) by offering these limited services to Mary Ann, because, according to the agency, they were—at least in some small way—aimed at addressing Mary Ann's problems and facilitating reunification.[10] As part of its argument, DCYF suggests that its minimalist efforts were sufficient to procure a TPR decree

---

**10.** Veloz–Rocheleau testified that the marriage counseling and the so-called "couples therapy" that Mary Ann received were designed to address only her problematic relationship with Dennis. She also testified during cross-examination that the counseling and therapy were in no way designed to provide either parenting education or independent counseling with respect to Mary Ann's relationship with Christopher and Kayla. As DCYF points out, however, these programs were among the many services Ms. Santos recommended for Mary Ann, and they were offered to her by the agency. In addition, DCYF argues that the Children's Museum program constituted a form of parenting education, and thus it was consistent with the evaluators' recommendations for Mary Ann. As we previously have noted, however, the trial justice found that, although the program provided a parenting-education component, it was "essentially a visitation program and in no wise substitute[d] for the specialized parenting classes recommended by Dr. Parsons." The record supports these findings.

under this subsection because the agency was not required by statute to make reasonable efforts to strengthen and encourage the parental relationship when it initiated termination proceedings under § 15–7–7(a)(3).

We have observed previously that even though "[s]ection 15–7–7(b)(1) requires DCYF to make reasonable efforts to reunite the parent with the child '[i]n the event that the petition is filed pursuant to subsection (a)(1), (a)(2)(i), or (a)(2)(iii) * * *,' * * * it is silent with respect to subsection (a)(3)." *In re Raymond C.*, 751 A.2d at 282; see also *In re Jason L.*, 810 A.2d 765, 767 (R.I.2002) (per curiam). Nevertheless, we also have remarked that, given the General Assembly's use of language in § 15–7–7(a)(3) requiring DCYF to offer (or the affected parent to receive) "services to correct the situation which led to the child being placed," the statute implies an obligation for child-placement agencies such as DCYF to employ reasonable efforts to do so under § 15–7–7(a)(3) as well. *See In re Brianna D.*, 798 A.2d at 415; *In re Joseph S.*, 788 A.2d at 477–78 ("Regardless of the unlikelihood for success, the department is required, pursuant to § 15–7–7(a)(3), to make reasonable efforts to strengthen the parental relationship until a termination petition is filed pursuant to § 15–7–7(b)(2)."). Such an interpretation is warranted because, other than subsection (a)(3), the remaining provisions of the statute that do not require a showing of reasonable efforts before termination constitute what this Court previously has described as "permanent-neglect" provisions. *See* § 15–7–7(a); *see also In re William, Susan, and Joseph*, 448 A.2d at 1255. Indeed, if we followed DCYF's argument to its logical conclusion, after twelve months of placement, the department would be able to succeed on a TPR petition if it offered *any* form of services to the parents, regardless of their utility to the parents or their potential for successfully addressing the family's particular needs to achieve reunification or to correct the situation that led to the children's removal from the parents' care. Such an approach is inconsistent with that portion of § 15–7–7(a)(3) that requires DCYF to demonstrate that "the parents were offered or received services *to correct the situation which led to the child[ren] being placed.*" (Emphasis added.) After all, if such services are to have any chance of success in correcting the situation that led to the children's removal from the family home, they must be "reasonable" in the sense of being capable of remedying the particular problem(s) that caused the children to be removed. As a result, we reaffirm our previous holdings in *In re Brianna D.* and *In re Joseph S.*, and conclude that § 15–7–7(a)(3) does require a showing that the services offered amount to reasonable efforts on the part of the agency to correct the situation that led to the children's removal from the parental home, thereby strengthening and encouraging the parental relationship, as described in § 15–7–7(b)(1).

Further, in light of this holding that DCYF must employ reasonable efforts at reunification before petitioning for termination under § 15–7–7(a)(3), the services offered or received must be designed to address or correct the situation that led to the child or children's placement in DCYF care or custody. *See In re William, Susan, and Joseph*, 448 A.2d at 1257 n. 3.

Turning to the services DCYF offered Mary Ann, we must assess them in light of the situation they supposedly were intended to correct. With respect to Mary Ann's cognitive impairment and her need for parenting education, we hold that the trial justice misconceived material evidence and clearly was wrong in concluding that DCYF offered Mary Ann reasonable ser-

vices aimed at correcting this aspect of the situation that led to the children's being placed. We reach this conclusion in light of the trial justice's findings that Mary Ann's mental condition was directly related to Christopher's and Kayla's placement and that the Children's Museum visitation program was inadequate to address Mary Ann's mental-health and parenting-skill needs. We also base this conclusion on testimony from multiple trial witnesses who said that DCYF's proffered marriage counseling or "couples therapy" was designed only to address Mary Ann's relationship with Dennis, but not to provide parenting education of any description, much less the specialized services that Dr. Parsons recommended as necessary if Mary Ann were to have any chance of reunification with her children. As a result, we hold, no legally competent evidence supported the trial justice's decision to terminate Mary Ann's parental rights on this basis pursuant to § 15–7–7(a)(3). In this respect, the trial justice's decision clearly was erroneous.

█ Nevertheless, we hold that this error was harmless in light of our determination that DCYF sustained its burden under § 15–7–7(a)(3) with regard to its attempted correction of the other aspect of the situation that led to her children's placement: namely, the mother's recurrent involvement with abusive, dangerous men and her resultant inability to provide a safe living environment for her children. The record clearly establishes Mary Ann's involvement in an abusive relationship with Dennis—one that also continuously placed her children in a dangerous situation. Mary Ann herself testified that she was forced to call the police on numerous occasions to escape from domestic violence initiated by Dennis. Indeed, the Family Court even ordered her to attend domestic-violence counseling based on one such occurrence.[11] In addition, Mary Ann's marriage counselor, Robin Boyajian, testified that Mary Ann informed her during counseling that she believed Dennis had sexually abused Christopher and Kayla, that she considered him a roadblock to her reunification with them, and that she wanted to initiate divorce proceedings. Although Boyajian assisted Mary Ann in procuring legal services and repeatedly offered to assist Mary Ann in filling out the necessary paperwork to procure a divorce, Mary Ann resisted initiating divorce proceedings against Dennis. After numerous postponements and missed counseling sessions, Mary Ann informed her marriage counselor that she finally had left Dennis, and that she had a new boyfriend, Pauly Brazil. Additionally, Mary Ann told another caseworker, Lori Edwards, that she was expecting another child, and that Brazil was the father.[12] Mary Ann testified at trial that Dennis recently had assaulted her when he was out of prison by grabbing her and by attempting to throw her out of the house while she was pregnant. Mary Ann also confirmed physical assaults by Brazil, recounting that Brazil had been violent with her in the past, including during her pregnancy with their child. Edwards also testified that Mary Ann told her about recent incidents of physical abuse involving Brazil. Although Mary Ann's marriage counselor scheduled meetings with her to discuss these incidents of

---

11. Although Mary Ann denied having initiated the incident leading to these court-ordered domestic-violence classes, she did admit at trial that Dennis successfully procured a restraining order against her based on his allegation that she had assaulted him.

12. At oral argument, Mary Ann's counsel informed us that, although she was pregnant with Brazil's child at the time of trial, Mary Ann voluntarily consented to the adoption of her third child at birth.

abuse, as well as Mary Ann's need to initiate divorce proceedings against Dennis, Mary Ann missed these meetings and did not reschedule them. In addition, Mary Ann displayed no intention at trial of either leaving Brazil or otherwise addressing the problem of recurring physical abuse in this new relationship.

Unlike DCYF's inadequate efforts in responding to Mary Ann's mental difficulties, DCYF offered and provided Mary Ann with appropriate services designed to address and ameliorate her problems with abusive male relationships such as these and their adverse impact on her children. In response to Pauline Santos's recommendations in this regard, DCYF provided Mary Ann with marriage counseling and couples therapy with Boyajian at Spurwink. As Boyajian testified, once Mary Ann identified Dennis as an abuser and as a barrier to her reunification with Christopher and Kayla, Boyajian repeatedly offered to assist Mary Ann in filing for a divorce from Dennis—even going so far as to refer her to appropriate legal services in this regard. Mary Ann, however, persistently skirted addressing this issue, and resisted actually completing the paperwork required to file for a divorce. In addition, although Boyajian initially aimed her therapy sessions only at Mary Ann's abusive relationship with Dennis, she also offered Mary Ann counseling to accommodate her concerns about the new abusive relationship she had entered into with Brazil. Mary Ann at first expressed interest in obtaining such counseling, but then she spurned it, failing to return Boyajian's calls and missing appointments with her. As a result, although DCYF offered her appropriate services designed to address her recurrent involvement in abusive relationships, Mary Ann failed to take the required steps to end these relationships or to restructure them in such a way so as to ensure domestic safety for herself and

her children. Thus, evidence in the record supports the trial justice's conclusion that DCYF offered and Mary Ann received services to correct this aspect of the situation that led to Christopher's and Kayla's initial placement with the department. On this basis, we affirm his decision finding the mother to be an unfit parent.

We recognize that the trial justice found that the mother's "intellectual limitations also created concerns with respect to her ability to protect her children from her abusive husband or other boyfriends," thereby suggesting that Mary Ann's mental deficiencies also affected her ability to navigate her relationships with these men in such a way as to protect the children from abuse. Nevertheless, protecting her children from the unsafe conditions created by these abusive relationships was one thing, but correcting the situation involving her entry into and her failure to end such relationships was quite another.

■ Given that DCYF undertook reasonable efforts to offer and provide Mary Ann with appropriate services to correct the abusive-relationship situation that also led to her children being placed with DCYF, we then must evaluate the trial justice's ultimate decision that terminating Mary Ann's parental rights was in the best interests of her children. A determination of the best interests of a child includes "the right of a minor child to reasonable care and maintenance, freedom from abuse or neglect, and the right to be given an opportunity to spend the remainder of his or her childhood in a family setting in which the child may grow and thrive." *In re Stephanie*, 456 A.2d 268, 271 (R.I.1983) (quoting *In re David*, 427 A.2d 795, 801 (R.I.1981)). Moreover, as we previously have observed, "[a]n environment in which mother's own safety is in constant jeopardy is certainly not a home where her child

is safe." *In re Natasha M.*, 800 A.2d 430, 431 (R.I.2002) (mem.). Thus, given Mary Ann's lack of cooperation in ending these abusive relationships—despite DCYF's reasonable efforts in this regard—the evidence presented in this case clearly supports the trial justice's conclusion that terminating Mary Ann's parental rights was in the best interests of Christopher and Kayla. As the trial justice observed, both children currently are in specialized foster homes. In addition, the children have demonstrated dramatic improvements in their level of adjustment since they were placed with the department.

Consistent with these determinations, we affirm the trial justice's decree terminating Mary Ann's parental rights with respect to both children pursuant to § 15–7–7(a)(3), and deny Mary Ann's challenge on appeal to the termination decree under this subsection.

## II

## The Visitation Issue

█ Finally, we turn to the department's petition for certiorari, which raises the visitation-pending-appeal issue. DCYF alleges that the trial justice committed an error of law when he initially compelled DCYF to continue to allow visitation between Mary Ann and her children after the Family Court entered the TPR decree. Essentially, DCYF argues that a Family Court decision terminating parental rights necessarily includes findings that the parents are unfit and that the cessation of parental visitation is in the best interests of the children. Therefore, DCYF argues, as guardian of the children following a TPR decree pursuant to § 15–7–7(d), DCYF should have the discretion to suspend visitation absent the parent's obtaining a stay of the TPR decree, or a separate Family Court order to the contrary. *See* Article I, Rule 8(a) of the Su-

preme Court Rules of Appellate Procedure (addressing the procedure for a stay of a trial court order pending appeal); *see also* § 15–7–20 (providing the Family Court with jurisdiction and authority to make "any orders that may be for the best interest of the child * * * until the final determination of the appeal").

Mary Ann and the Court Appointed Special Advocate (CASA), acting as guardian ad litem for Christopher and Kayla, argue that § 15–7–7(b)(2) guarantees a parent who is appealing a TPR decree continued visitation with his or her children during the pendency of the appeal. This subsection provides, in pertinent part: "This provision shall not be construed and is not intended to limit or affect in any way the parents' right to see or visit with the child during the pendency of a petition under this section." Section 15–7–7(b)(2). Essentially, Mary Ann and CASA suggest that even after the Family Court grants a TPR petition, the petition still remains pending if the parent involved has filed a timely notice of appeal—at least until this Court finally resolves the appeal. Thus, they argue, any previously existing visitation orders should remain in force until and unless this Court dismisses the appeal or affirms the TPR decree—unless DCYF moves for and obtains a court order allowing it to terminate visitation during the appeal. DCYF counters that once the Family Court has adjudicated a parent to be unfit and has issued a TPR decree, the parental right of visitation should end because the TPR petition no longer is pending, despite the fact that the parent whose rights have been terminated has filed a timely appeal. Rather, only the appeal from the TPR decree is pending, not the TPR petition itself.

Despite DCYF's arguments, it does not dispute that it eventually obtained the original relief it sought by initially denying

visitation to Mary Ann pending the appeal: namely, the suspension of Mary Ann's visitation rights pending the ultimate decision on this appeal. Thus, after the Family Court granted Mary Ann's motion to compel continued visitation during the appeal, DCYF separately moved in that court for suspension of visitation, arguing that terminating Mary Ann's visits with Christopher and Kayla during the appeal was in the children's best interest. Ultimately, the Family Court agreed with DCYF, granted its motion, and suspended Mary Ann's visitation privileges. Mary Ann did not appeal from or seek further review of that order.

"This Court has consistently held that a case is moot if the original complaint raised a justiciable controversy, but events occurring after the filing have deprived the litigant of a continuing stake in the controversy." *Cicilline v. Almond,* 809 A.2d 1101, 1105 (R.I.2002) (per curiam) (quoting *Associated Builders & Contractors of Rhode Island, Inc. v. City of Providence,* 754 A.2d 89, 90 (R.I.2000)). Although DCYF initially was unsuccessful in suspending visitation pending the appeal on this issue, it remedied the situation by separately moving to obtain this same relief—namely, the suspension of Mary Ann's visitation rights pending her appeal. Thus, at the time of DCYF's petition for a writ of certiorari, the department already had obtained the relief it initially requested. And because Mary Ann did not appeal from or seek to stay the suspension of visitation, no case or controversy remains between the parties concerning this issue. As a result, this question is now moot as it concerns Mary Ann and her children.

We typically refrain from adjudicating moot issues, except when certain emergent factual circumstances are present that are absent in this case. As we have held:

"This Court will not adjudicate a moot case unless the issues raised are 'of extreme public importance, which are capable of repetition but which evade review.' *Sullivan v. Chafee,* 703 A.2d 748, 752 (R.I.1997) (quoting *Morris v. D'Amario,* 416 A.2d 137, 139 (R.I.1980)). 'The reason this is so is that whenever a court acts without the presence of a justiciable case or controversy, its judicial power to do so is at its weakest ebb.' *Sullivan,* 703 A.2d at 752. '[C]ases demonstrating extreme public importance are usually matters that relate to important constitutional rights, matters concerning a person's livelihood, or matters concerning citizen voting rights.' *Associated Builders,* 754 A.2d at 91." *Cicilline,* 809 A.2d at 1105–06.

Here, DCYF has not demonstrated that the visitation question is of such extreme public importance. Although we have held that a parent's right to visit his or her child is a fundamental right of a parent, *see In re Kristen B.,* 558 A.2d at 203 (citing *Santosky v. Kramer,* 455 U.S. 745, 759–60, 102 S.Ct. 1388, 1398, 71 L.Ed.2d 599, 611 (1982)), Mary Ann has not challenged the Family Court decision suspending her visitation privileges with Christopher and Kayla. Rather, it is DCYF that is raising this procedural issue. As a state child-placement agency, DCYF does not possess a constitutional right to be free from providing visitation to mothers and fathers pending their appeal from decrees terminating their parental rights. Therefore, especially in light of the fact that DCYF can request suspension of an unfit parent's visitation privileges merely by filing a separate motion with the Family Court requesting such relief, we are not prepared to find that this procedural matter is of such public importance that it warrants adjudication when no case or

controversy about this issue remains pending in this case.

Moreover, even if we determined that this issue was one "of extreme public importance," DCYF has not demonstrated that the issues presented in this case are capable of repetition yet likely to evade judicial review. Although DCYF has alleged that this particular visitation issue "recurs with occasional frequency in [TPR] cases," it has not argued or demonstrated that the subject matter of this petition—DCYF's alleged right to unilaterally terminate parental visitation after a TPR decree but before an involved parent's appeal has been resolved—will evade judicial review in the future. If the Family Court compels DCYF to provide visitation pursuant to a pre-termination visitation order, the department could move in the Family Court for a stay of this order pending its appeal or application for review to this Court of any such visitation order, as permitted by Rule 8(a). Here, DCYF did not follow this procedural course, but instead filed a later motion in the Family Court to suspend Mary Ann's visitations with her children pending her appeal, which the trial court granted. Because Mary Ann never appealed this decision, her visitation privileges with Christopher and Kayla have been suspended during the pendency of this appeal, and will remain so until and unless the Family Court orders otherwise. As a result, the visitation issue that DCYF raised in its petition for certiorari is moot, and is not properly before this Court. Thus, we deny the petition and quash the writ of certiorari as improvidently granted.

## Conclusion

For these reasons, we sustain the mother's appeal in part and deny it in part. Reversing the Family Court's decision to terminate Mary Ann's parental rights pursuant to § 15–7–7(a)(2)(i) (mental deficiency), we vacate that portion of the TPR decree. But we deny Mary Ann's appeal with respect to § 15–7–7(a)(3) (children in DCYF's care for twelve months), and affirm the Family Court decree authorizing termination of her parental rights under this subsection of the law—even though we do so on different grounds from those that the trial justice relied upon. With respect to the visitation issue that DCYF brought before the Court by writ of certiorari, we deny the petition as moot, quash the writ as improvidently granted, and return the papers to the Family Court with our decision endorsed thereon.

Justice FLAHERTY did not participate.